UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| JENNIFER LYNN DARNELL, | ) | |
|---|---|---|
| | ) | |
| *Plaintiff*, | ) | 2:17-CV-00103-MCLC |
| | ) | |
| vs. | ) | |
| | ) | |
| WOODBOURNE INVESTMENTS, LLC, | ) | |
| WALTER SCHWAB IRREVOCABLE | ) | |
| TRUST, JASON ARTHUR, ESQUIRE; | ) | |
| AND LISA MICHELLE GIBSON, | ) | |
| | ) | |
| *Defendants* | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendants have filed a Motion for Sanctions [Docs. 36, 38, 51] along with an accompanying memorandum of law in support [Docs. 37, 39, 52]. Plaintiff has responded [Doc. 45, 47-49]. Defendants filed their reply [Docs. 54, 55]. Plaintiff has also filed a motion to disqualify counsel [Doc. 41]. The matter is now ripe for resolution.

**I. BACKGROUND**

Woodbourne Investments, LLC ("Woodbourne") and the Walter Schwab Irrevocable Trust ("the Trust") obtained a judgment against Jimmy Boyd ("Boyd") in the state of Missouri, the combined amount of which exceeded $600,000.00 [Doc. 28-3]. Plaintiff does not contend that this judgment was obtained fraudulently, illegally or was not otherwise fully enforceable by Boyd's creditors, Woodbourne and the Trust.

Woodbourne and the Trust discovered that Boyd held property in Washington County,

Tennessee in a LLC titled "JHB & Sons Excavating, LLC" (hereinafter "JHB").[1] In an effort to collect on that judgment, Woodbourne and the Trust filed a collection action in Tennessee. On March 30, 2017, as part of that action, they obtained from a state court a Temporary Restraining Order, ("TRO"), preventing Boyd from dissipating any of his assets that might be used to satisfy their judgment during the fifteen days the TRO was effective [Doc. 1-1]. The TRO, which expired by its own terms on April 12, 2017, only applied to Boyd and did not mention Plaintiff. Although the TRO mentioned real estate in Washington County, Tennessee, in the name of "JHB & Sons Excavating, LLC," the identifiers were to JHB's personal property located in Washington County and not real property. In fact, there was no evidence that "JHB & Sons Excavating, LLC" held any real property in Washington County, Tennessee.

On May 15, 2017, Plaintiff intervened in the state action, claiming the TRO affected the real property she held in her own name in Washington County, Tennessee [Doc. 20-3, *Motion to intervene*]. As she did in this case, she alleged in her motion to intervene that she had sustained damages because she "was in the process of obtaining a construction loan in order to improve the property; however, due to her property being included in the Temporary Restraining Order the progress of the loan has been jeopardized…." [Doc. 20-3, pg. 3]. On June 3, 2017, Plaintiff and her counsel in state court (who was not Mr. Vaughn) met with counsel for Woodbourne and the Trust and came to the consensus that her real property was not included in the TRO.[2] Counsel for

---

[1] In fact, Jimmy Boyd filed a lawsuit in the Chancery Court for Washington County, Tennessee, in the name of "JHB and Sons Excavating, LLC" as the "Chief Manager" of the LLC. This suit was removed from state court to federal court where Boyd voluntarily dismissed it. See *JHB and Sons Excavating, LLC v. Bass et al.,* No. 2:15-cv-244 (E.D.TN).

[2] The actual state court order states that Plaintiff "determined and agreed" that the parcel numbers listed in the TRO were "designated account numbers for Washington County, Tennessee's Personal Property Appraisal accounts for JHB & Sons Excavating, LLC and are not real property parcel designations." [Doc. 20-4, pg. 3].

both Plaintiff and for Woodbourne and the Trust appeared before a state court judge and announced their agreement, clearly and unequivocally, indicating that the TRO did not include any of Plaintiff's real property she held personally in Washington County, Tennessee. [Doc. 20-4, pg. 3].

Notwithstanding that agreement, on June 27, 2017, Plaintiff and her new counsel, Mr. Vaughn, filed this Complaint, alleging that Woodbourne, and the Trust, Defendant Lisa Michelle Gibson, and her attorney, Mr. Jay Arthur, Esq., committed fraud, intentionally interfered with business relations, and engaged in a civil conspiracy. Specifically, she alleged the TRO improperly included her real property in Washington County, Tennessee [Doc. 1, *Complaint*, ¶ 22]. She also claimed that an anonymous female called her loan broker, Mr. Ken Mahaffy, and stated "the property had a lien against it and was part of an active lawsuit involving Mr. Jimmy Boyd." [Doc. 32-3, pg. 2]. The female caller then hung up before Mr. Mahaffy could obtain any other information. As a result, Mr. Mahaffy claimed he "was forced to put the lender on hold indefinitely regarding financing the storage unit project due to the property title being clouded." [Doc. 32-3, pg. 2]. Plaintiff does not know who this female was. The Court granted Defendants' motions to dismiss after converting it to a motion for summary judgment and providing the parties an opportunity to engage in any discovery necessary to supplement the pleadings [Doc. 63].

**II.  ANALYSIS**

Now before the Court are Defendants' motion to sanction Plaintiff and her counsel Mr. Kyle Vaughn, Esq. for filing a false and fraudulent Complaint. In their Rule 11 motion, Defendants allege that Plaintiff's attorney knew or should have known the Complaint he was signing was false. They allege he did not make a reasonable inquiry into the facts before signing and filing the Complaint.

Pursuant to Rule 11, an attorney's signature on a pleading certifies that, to the best of the attorney's knowledge, information, and belief, formed after a reasonable inquiry:

> (1) [the document] is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11. Rule 11 requires an attorney who has signed a pleading to fulfill three obligations. *Jackson v. Law Firm of O'Hara, Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989). The attorney must conduct a reasonable inquiry to determine that the pleading is well grounded in fact; the attorney must conduct a reasonable inquiry to determine that the positions taken are warranted by existing law or as good faith arguments for an extension or modification of existing law; and the pleading must not be filed for an improper purpose. See *Chopra v. Physicians Med. Ctr., LLC,* No. 16-13915, 2017 WL 1901920, at *2 (E.D. Mich. May 9, 2017).

Plaintiff sued all four Defendants for allegedly including her real property in the TRO which she claimed caused her lender to terminate the lending commitment [Doc. 1, ¶ 26]. However, the TRO, by its own terms, did not apply to her. It applied only to Boyd, a fact to which she and her counsel in state court had stipulated [Doc. 20-4, pg. 3]. She also sued Gibson, who had absolutely nothing to do with the TRO.

There are times where one alleges facts in good faith with the idea that additional discovery is necessary to determine the specifics. Even when that occurs, that does not remove the attorney's responsibility to investigate the case. It certainly does not countenance filing a suit in hopes of turning up something. Suits should not be used as a fishing expedition.

> [S]ometimes a litigant may have good reason to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation. Tolerance of factual contentions in initial pleadings by plaintiffs or defendants when specifically identified as made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties, make claims, or present defenses without any factual basis or justification.

Fed.R.Civ.P. 11 advisory committee note to 1993 amendment. That Plaintiff could not identify this unknown female caller did not give her the license to sue Gibson and her attorney without factual basis or justification. *Id.*

Based on these facts, Plaintiff and her counsel alleged Defendants intentionally interfered with existing or "perspective [sic] business relations." [Doc. 1, pg. 6]. Tennessee recognizes the tort of intentional interference with business relationships. See *Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). The elements of this tort are as follows:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Id.* Here, Plaintiff alleged that she "had a relationship with the loan broker and the deal was secured until the 'anonymous' phone call was made to the loan broker, Ken Mahaffy…." [Doc. 1, ¶ 30]. She alleged that Defendants knew of this loan broker because Gibson had turned over Boyd's phone records to her attorney Jay Arthur. She also alleged all the Defendants meant to harm her because they "knew … the [p]roperty … was clearly owned by the Plaintiff" and that their motives

5

were to "destroy and prevent Plaintiff from prospering because of her relationship to Boyd." [Doc. 1, ¶ 32-33].

Plaintiff's real property was never affected by the TRO. Plaintiff knew that and her counsel should have as well. Thus, acquiring the TRO could not have interfered with her business relationships as she alleged. That leaves the anonymous female caller. Plaintiff claims that this phone call to Mr. Mahaffy caused the entire project to end. But Mr. Mahaffy does not allege that the lender terminated the deal. Rather, he claimed that he did. He said that he "was forced to put the lender on hold indefinitely…." [Doc. 32-3, pg. 2]. That is all that she has in this case. That she cannot identify the female caller does not authorize her to file a $20,000,000.00 lawsuit against these parties.

Plaintiff alleged all Defendants committed fraud against her by "falsely stat[ing] the Property on the temporary restraining order belonged to Boyd." [Doc. 1, ¶ 38]. She alleged that attorney Arthur "was well aware the Property belonged to the Plaintiff because Arthur harassed the Plaintiff through depositions." [Doc. 1, ¶ 38]. She alleged that attorney Arthur "utilized [his] standing as an officer of the trial court to mislead the trial court and harass the Plaintiff to extort a result from Boyd…." [Doc. 1, ¶ 44]. But Plaintiff had already been in state court and agreed her property was not affected by the TRO. She knew that attorney Arthur had not misled the trial court whatsoever. She even stipulated that the TRO did not impact her property. For her now to claim that the attorney mislead the state court is disingenuous to say the least. But Plaintiff goes further than claim the attorney lied to the state court, she accuses him of extorting her father and creditor, Jimmy Boyd. And, she has no basis to do so.

These are very serious accusations to make of an attorney, who as Mr. Vaughn knows, is an officer of the court.[3] Accusing an attorney of unethical conduct, of intentionally misleading a court, of engaging in extortion --- these can destroy an attorney's livelihood. These allegations cannot be justified as just the product of zealous advocacy. Lawyers battle in the courtroom all the time. That is expected, and zealous advocacy makes the system work. But the battle is not without rules. An attorney cannot simply blindly follow the dictates of an upset client. The advocate must certify under Rule 11 that the factual contentions have evidentiary support or "will likely have evidentiary support after a reasonable opportunity for further investigation…" Fed.R.Civ.P. 11(b)(3). In this case, that certification is lacking. In fact, when given the opportunity to develop these facts, Plaintiff and Mr. Vaughn engaged in no discovery and made no effort to develop them. This lack of engagement is not surprising because no additional discovery would have revealed any new facts that would have justified the allegations in the Complaint. Plaintiff knew that the TRO the attorney drafted and which the state court approved, did not include her property.

Finally, Plaintiff alleged Defendants engaged in a civil conspiracy to harm her. The basis of her claim here is that all the Defendants "obtained an illegal restraining order against Plaintiff because the Plaintiff was not duly noticed or advised the Plaintiff's property was part and parcel to the proceedings in the Sullivan County trial court." [Doc. 1, ¶ 49]. She alleged that attorney Arthur and Gibson tried to harm Boyd, but instead harmed Plaintiff [Doc. 1, ¶ 50].

---

[3] "The role of a lawyer as an officer of the court predates the Constitution; it was carried over from the English system and became firmly embedded in our tradition. It included the obligation of first duty to client. But that duty never was and is not today an absolute or unqualified duty. It is a first loyalty to serve the client's interest but always within—never outside—the law, thus placing a heavy personal and individual responsibility on the lawyer." *Application of Griffiths*, 413 U.S. 717, 732, 93 S. Ct. 2851, 2860, 37 L. Ed. 2d 910 (1973).

This cause of action is also without any basis. "An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). Plaintiff claims the TRO was illegal because she did not receive notice of it. She was not entitled to notice because it did not pertain to her or her property. By its own terms it only pertained to Boyd. Woodbourne and the Trust were simply trying to collect on a debt. That is not an unlawful purpose and obtaining a TRO is not an unlawful means of attempting to achieve the lawful purpose of collecting the debt. The facts do not support this cause of action, but more importantly, Plaintiff and her counsel knew or should have known that they did not.

Not only are the factual allegations without evidentiary support, but the prayers for relief are as well. Despite the fact that the TRO did not pertain to or relate to Plaintiff, she requests the Court to order Defendants pay her $150,000.00 in the bond money that should have been posted to secure the TRO [Doc. 1, pg. 10]. Next, she asks for $4,000,000.00 in compensatory damages and $18,500,000.00 in punitive damages "due to extreme and outrageous conduct of the Defendants." [Doc. 1, pg. 10].

In response to Defendants' motions for sanctions, Mr. Vaughn conceded that "the T.R.O. alone does not properly encompass the real property which is why plaintiff intervened to have the matter sorted out and correctly adjudged."[4] [Doc. 61, pg. 2]. But the "sorting out" already occurred in state court before she filed this case. Yet she filed this Complaint in spite of her earlier

---

[4] Despite his earlier concession, Mr. Vaughn continues to argue even in response to the sanctions motion that Plaintiff's property was "falsely and fraudulently" included in the TRO in state court. [Doc. 61, pg. 2].

agreement, alleging her "property was improperly included on the temporary restraining order by Arthur." [Doc. 1, ¶ 22]. Plaintiff knew this was not accurate and Mr. Vaughn should have known it was factually incorrect.

Mr. Vaughn claims that "[t]he defendants continued to abuse the process of law until the defendants were served with this lawsuit…." [Doc. 61, pg. 3]. But this claim is undercut by the state court order that details the timing of Plaintiff's intervention in the state case, her appearance with her counsel and counsel for Defendants in state court, and her agreement that the TRO did not include her real property. All of this occurred *prior* to her filing her Complaint in this case. That Mr. Vaughn claims Defendants "abused the process of law" is again not supported by the facts, and a reasonable investigation would have revealed that.

Perplexing is Mr. Vaughn's claim that he, in fact, "researched all of the information provided and determined that actions of the defendants were clearly actionable under the laws of the State of Tennessee and within the jurisdiction of this … Court." [Doc. 61, pg. 7]. Mr. Vaughn does not identify what research or investigation he performed prior to accusing Defendants of fraud and the attorney of misleading the court, and extorting a third-party and suing all of them for more than $20,000,000.00. He does not state what documents he examined, what steps he took to determine whether the allegations of his client were true, or even if he contacted her prior counsel. Instead, he simply concludes he "researched all of the information provided…." *Id.* To be sure, if he had, this suit would not have been filed.

Rule 11 was designed to avoid these kind of lawsuits. In determining whether sanctions may be imposed, the Sixth Circuit has stated the appropriate test is "whether the individual's conduct was reasonable under the circumstances." *International Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 304 (6th Cir. 2005). As noted, the

9

Court finds that Mr. Vaughn's conduct was not reasonable under the circumstances, but that does not end the inquiry.

The next issue is whether Defendants have complied with Rule 11's procedural prerequisites to obtain sanctions. Rule 11 provides that the motion for sanctions "must be served under Rule 5, but it must not be filed or be presented to the court if the challenged … claim [or] … contention … is withdrawn … within 21 days after service…." Fed.R.Civ.P. 11(c)(2). This "safe harbor" provision mandates service of the *motion* at least 21 days before it is filed to give the opposing side the opportunity to see the folly of their ways and make corrective action without incurring any additional expense. This requirement is "unquestionably explicit" and an "absolute requirement" for seeking Rule 11 sanctions. *Ridder v. City of Southfield*, 109 F.3d 288, 296 (6th Cir. 1997). "Therefore, a party seeking sanctions must follow its two-step process: first, serve the Rule 11 motion on the opposing party for a designated period (at least twenty-one days); and then file the motion with the court." *Tillman v. Apostolopoulos*, 2010 WL 5088763, at *1 (E.D. Mich. Dec. 8, 2010) citing *Ridder*, 109 F.3d at 294. A failure to follow this "rigid procedure is fatal to a request for sanctions under Rule 11." *Id.* In fact, in *Ridder,* the Court denied a Rule 11 motion for sanctions as the party had failed to serve the motion on the opposing party 21 days before filing the motion. *Ridder*, 109 F.3d at 297.

Rule 11 requires more than giving informal notice of the party's intention to seek sanctions. As noted in *Tillman*, "a party seeking sanctions must serve the actual Rule 11 motion on the party sought to be sanctioned prior to filing it with the court." *Tillman*, 2010 WL 5088763, at *1. Simply sending a warning letter is not sufficient under the plain terms of the Rule. See *Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 767 (6th Cir. 2014)("We have no doubt that the word "motion" definitionally excludes warning letters, and our reading of the rule's plain language finds

support in the Advisory Committee's Notes"). Rule 11 uses the term "motion" and not notice. In this case, Defendants' motion for sanctions is dated and filed September 22, 2017 [Doc. 51]. Defendants do not claim that they sent the motion to Mr. Vaughn 21 days prior to its filing. Accordingly, they have not demonstrated they have complied with the specific requirements of Rule 11, which are the *sine qua non* to its application. "[N]ot only Rule 11's text, but also '[p]ragmatic realities require such strict adherence to the rule's outlined procedure.'" *Id.* at 768, citing *Ridder*, 109 F.3d at 297.

Accordingly, Defendants' motions for sanctions [Doc. 36, 38, 51] are DENIED. Plaintiff's motion to disqualify counsel [Doc. 41] is DENIED AS MOOT. These are the final motions pending in this case. The Court directs that the clerk enter a final judgment dismissing this case with prejudice and close the case.

SO ORDERED:

s/Clifton L. Corker
United States Magistrate Judge
